IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 23, 2010 Session

## JOSEPH DEJUAN WEBSTER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2005-B-1384    Steve Dozier, Judge**

_____

**No. M2009-01540-CCA-R3-PC - Filed June 28, 2010**

_____

Petitioner, Joseph Dejuan Webster, was convicted by a Davidson County jury of first degree murder. *State v. Joseph Dejuan Webster*, No. M2007-00050-CCA-R3-CD, 2008 WL 2229208, at *1 (Tenn. Crim. App., at Nashville, May 29, 2008), *perm. app. denied*, (Tenn. Dec. 8, 2008). He received a life sentence for the conviction which was ordered to be served consecutively to a prior sentence. *Id.* Subsequently, Petitioner filed a petition for post-conviction relief. Petitioner filed an amended petition, and the post-conviction court held a hearing. After the hearing, the post-conviction court denied relief. We have reviewed the record and conclude that Petitioner has failed to show that he received ineffective assistance of counsel. Accordingly, the judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Theodora Pappas, Brentwood, Tennessee, for the appellant, Joseph Dejuan Webster.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Victor S. Johnson, District Attorney General, and Rachel Sobrero, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Factual Background*

Petitioner was indicted in April of 2005 for the first degree murder of Leroy Owens that occurred on November 22, 1998. At trial, the following testimony led to Petitioner's conviction:

Tammy Nelson testified that she was living in an apartment complex at 159 Hermitage Avenue in November of 1998. She and Leroy Owens, the victim, were friends. She knew the victim as "Little Nick," and he would sometimes stay at her apartment. Ms. Nelson and the victim had used drugs together in the past.

According to Ms. Nelson, around the beginning of November, a man named Robert Nichols, who was known as "Big Nick," wanted "some dope." The victim offered to call his "cousin" who had some "good stuff." Two men, one of whom was [Petitioner], arrived at Ms. Nelson's apartment. The men claimed that the victim already owed them some money. The victim and "Big Nick" pooled their money together and "got the drugs" from the two men. The men left the apartment. Ms. Nelson was under the impression that the victim and "Big Nick" were going to divide the drugs up for resale to make some money, but "Big Nick scammed Little Nick out of his money."

About three days later, [Petitioner] and the other man that brought the drugs, returned to Ms. Nelson's apartment, looking for the victim. Ms. Nelson specifically identified [Petitioner] as one of the men that came to her door. The men came to her apartment five or six times looking for the victim. At some point, the two men gave Ms. Nelson a pager number and told her to call them when she saw the victim. On November 21, 1998, the victim came to her house. The victim and Ms. Nelson got high together, and the victim stayed the night at her apartment. Ms. Nelson called the pager number to let the men know that the victim was at her apartment. The two men arrived at Ms. Nelson's apartment in a white station wagon on the morning of November 22, 1998. When they arrived, the victim was asleep. Ms. Nelson woke the victim up to tell him that [Petitioner] and the other man were there to see him. [Petitioner] went to the car where Ms. Nelson saw him put on gloves and get a stick. The other man "snatched" the victim out of the front door of Ms.

Nelson's apartment. Ms. Nelson saw [Petitioner] start hitting the victim with his hands. The victim took off running, escaping over a fence. As he was running away, one of his black tennis shoes came off his foot. [Petitioner] and the other man got into their car to chase the victim. About thirty minutes later, Ms. Nelson learned that the victim was dead.

The victim ran to Delunn Todd Hyde's house. According to Mr. Hyde, the victim entered his house without being invited inside. The victim looked like he had been beaten up, was missing a shoe and had bruises under his eye. The victim's pants were "halfway down." The victim acted "scared" and asked to use Mr. Hyde's telephone. Mr. Hyde did not want to get involved, so he escorted the victim out of his house. The victim asked Mr. Hyde to look outside to see if there was a white car. Mr. Hyde reported that he did not see a white car. At that point, the victim "took out across the street running." Mr. Hyde then saw a white "souped up" station wagon coming over the hill toward the victim. The car "flew right behind" the victim. Mr. Hyde could tell that there were two black men in the car and remembered that he had seen the same car the night before on Lewis Street. About thirty minutes after the victim left his house, Mr. Hyde walked to the scene of the incident and learned that the victim was dead.

Fred McClain testified that on November 22, 1998, he was "doing some concrete" work for a small restaurant on the corner of Green Street and Wharf Avenue. Around 11:30 a.m., Mr. McClain heard a car pull up and brakes "screeching." The next thing he saw was a "man running." The man running turned out to be the victim, Leroy Owens. He also saw a "white car that pulled up, that the two fellows jumped out of." The two men were black and one of the men was about five feet nine inches tall and weighed about two hundred and twenty-five or two hundred and thirty pounds. The other man was smaller, "about five eight and weighed about one seventy-five." The car was an older white station wagon with "chrome wheels."

The two black men from the car "bum rushed" or "tackled" the victim while he was running. This caused the victim to actually bump into Mr. McClain, who hit his head on the food service window of the restaurant. Mr. McClain got up and ran around a corner to the side of the building. When he peered around the corner, he saw the larger of the two men standing over the victim, who was lying on the ground. The larger man was hitting the victim with a cinder block. Mr. McClain heard the man ask, "Where's my goddamn money?" Mr. McClain saw the man hit the victim twice with the cinder block

before the two men left in the station wagon. Once the two men left, Mr. McClain could see blood running out of the victim's head where he had been hit with the block. The victim was silent and still. Mr. McClain was unable to identify the attackers.

. . . .

Detective Brad Corcoran and Detective Pat Postiglione investigated the murder of the victim. Around 7:00 p.m. on the day of the murder, Detective Corcoran and Detective Postiglione went to 1245 Lewis Street and spoke with a woman named Katrina Norman. At the time, Ms. Norman was [Petitioner's] girlfriend. At the time of trial, she was married to [Petitioner] and went by the name Katrina Webster. Detective Corcoran informed Ms. Norman that he was trying to locate [Petitioner] and the white station wagon that had been described by several witnesses. Ms. Norman told Detective Postiglione that she knew the owner and driver of the car but refused to identify them. Ms. Norman, who had [Petitioner's] first name, "Joseph," tattooed on her neck, was uncooperative and actually became "very defensive" during questioning. At trial, Ms. Norman testified that she did not know anything about the victim's murder. She also denied that she told the police she knew the owner and driver of the white station wagon.

Detective Postiglione was the first person to interview Ms. Nelson. She initially denied knowing the victim but later explained what occurred on the day of his murder. Ms. Nelson identified [Petitioner] from a photographic lineup. She also identified [Petitioner] at trial. According to Detective Postiglione, Ms. Nelson was "fearful," "upset and crying."

. . . .

[Petitioner] took the stand in his own behalf. He claimed that he did not remember what he did on November 22, 1998. [Petitioner] denied ever owning a white station wagon. Further, [Petitioner] claimed that he did not know Tammy Nelson. [Petitioner] stated that he was dating Ms. Norman at the time of the incident and that she lived on Lewis Street.

. . . .[After being convicted by the jury, Petitioner] filed a motion for new trial in which he argued that he had "obtained newly discovered evidence that was not available to counsel at the time of trial." Attached to the motion were affidavits from Marie Burns, [Petitioner's] mother; Katrina Norman,

[Petitioner's] wife; and Arthur Gordon, [Petitioner's] brother. The affidavits alleged that [Petitioner's] brother, Kenneth Neal, was the owner of the white station wagon and was the perpetrator who killed the victim. [Petitioner] later filed an amended motion for new trial in which he raised additional grounds for relief.

. . . .

[At the hearing on the motion for new trial], Marie Burns testified that her son Kenneth Neal was the owner of the white station wagon. Ms. Burns admitted that she was questioned in 1998 by Detective Postiglione about the white station wagon. She claimed that Detective Postiglione never asked if [Petitioner] owned the white station wagon. She did not tell the detective that Mr. Neal was the owner of the car. Ms. Burns claimed that [Petitioner] told her prior to being arrested for the victim's murder that Mr. Neal "went out south and killed that man," but that she never told anyone about it because [Petitioner] told her he "didn't want to see [her and [Petitioner's] wife] hurt." According to Ms. Burns, she approached counsel for [Petitioner] immediately after trial and told her that Mr. Neal killed the victim. In fact, Ms. Burns claimed that Mr. Neal admitted to the murder.[FN3] Ms. Burns stated that she had a conversation with Mr. Neal prior to [Petitioner's] trial in which Mr. Neal told her that the jury would not convict [Petitioner] of the crime because he and [Petitioner] "don't look alike" and that he was the one that "did it." Ms. Burns was afraid to tell anyone, but thought that after [Petitioner] was convicted, it was time to come forward with the information.

> [FN3] There was an audiotape admitted into evidence at the hearing that allegedly contained a conversation between Mr. Neal and Ms. Burns in which Ms. Burns accused Mr. Neal of committing the crime. After listening to the audiotape, it appears to be of a conversation between Ms. Norman, referred to in the tape as "Trina," and Mr. Neal. During the discussion, from what we could understand, Ms. Norman expresses her frustration with Mr. Neal's lack of monetary assistance to support [Petitioner's] defense. We could not locate a portion of the tape in which there was a conversation between Ms. Burns and Mr. Neal. The conversation between Ms. Norman and Mr. Neal appears to be followed by a tape recording of a lecture on Tennessee history and the Chickasaw Treaty.

-5-

Arthur Gordon testified that his brother, Mr. Neal, told him that he committed the murder that [Petitioner] was convicted of committing, but he could not remember when that conversation occurred. On cross-examination, Mr. Gordon stated that the conversation may have occurred about "three weeks" after the murder. Mr. Gordon also informed the court that Mr. Neal owned a white station wagon in 1998. Mr. Gordon testified that Mr. Neal told him that the car was taken to Kentucky and "destroyed."

Katrina Norman Webster testified at the hearing on the motion for new trial. She claimed that she knew that Mr. Neal committed the murder in 1998, but did not tell anyone about it because she was scared of Mr. Neal. She decided to come forward with the information after trial because her husband was convicted for a crime that he did not commit.

Kenneth Neal denied that he owned a white station wagon in 1998. He admitted that Ms. Burns questioned him about the murder but claimed that he walked out the door instead of talking to her about the murder. When asked why he did not specifically deny committing the murder, Mr. Neal responded, "I didn't have a reason to say anything about it."

*Joseph Dejuan Webster*, 2008 WL 2229208, at *1-4 (footnotes omitted).

On direct appeal, Petitioner argued that new evidence was available to prove that his brother actually committed the crime. *Id.* at *1. This Court affirmed the judgment of the trial court, determining that "the evidence was available prior to [Petitioner's] trial and [Petitioner] has failed to show that he used reasonable diligence in seeking the newly discovered evidence." *Id.*

The supreme court denied permission to appeal on December 8, 2008. On January 23, 2009, Petitioner filed a pro se petition for post-conviction relief. Petitioner subsequently filed an amended petition.[1]

In the petitions, Petitioner alleged that he received ineffective assistance of counsel at trial and on appeal. Specifically, Petitioner complained that trial counsel: (1) erred in jury selection; (2) failed to present a trial strategy during opening statement; (3) failed to call alibi witnesses; (4) failed to object to various statements of witnesses during trial; (5) failed to

---

[1]On appeal, the State alleges that the petition was filed six weeks after the expiration of the statute of limitations. Our review of the record indicates that the petition herein was filed within one year of December 8, 2008, and therefore timely.

properly investigate the case; (6) failed to file a motion to suppress the identification of Petitioner; (7) failed to adequately prepare for trial; (8) failed to preserve and raise various issues for appeal; (9) failed to adequately advise Petitioner about the right to testify; (10) failed to effective cross-examine witnesses for the State; (11) failed to ask for a jury instruction on accomplice testimony; and (12) failed to present proof on Petitioner's behalf at sentencing. Additionally, Petitioner complained that counsel failed to raise various issues on appeal. Finally, Petitioner complained that his conviction was based on the knowing use of the perjured testimony of Tammy Nelson.

The post-conviction court held a hearing on the petition for relief. At the hearing, Robert Lyons, a private investigator for Petitioner's trial counsel, testified that he interviewed State witness Tammy Nelson twice in October of 2005. These interviews took place about seven years after the victim's death and after the police had taken a formal statement from Ms. Nelson. According to Mr. Lyons, Ms. Nelson could not identify the two "short black males" who murdered the victim. Additionally, she was unable to provide any distinguishing characteristics of the perpetrators.

Petitioner presented the testimony of Dr. Ulysses Walls, a Nashville dentist. Dr. Walls testified that in 1995 or 1996, he placed six permanent gold teeth in Petitioner's upper jaw. The teeth were distinct in that they had the initials "JW" on them. Dr. Walls saw Petitioner as a patient a second time. At this visit, Dr. Walls noticed that Petitioner had more gold teeth on the lower jaw. Dr. Walls did not place the gold teeth on Petitioner's lower jaw. Dr. Walls was unable to provide medical records of Petitioner's visits due to a burglary at his office.

Petitioner testified at the hearing that by the end of 1996 he had a total of twelve gold teeth, six on the upper jaw and six on the lower jaw. At this time, Petitioner would have been sixteen or seventeen years old. According to Petitioner, the top teeth bore the initials "JW" as well as "a dollar sign." Petitioner did not recall whether he testified at trial that he was eighteen years old when he got his gold teeth.

Trial counsel took the stand at the post-conviction hearing. He and another attorney represented Petitioner at trial and on appeal. Trial counsel confirmed that he hired Investigator Lyons to help with the investigation of the case. Trial counsel was present during one of the interviews of Ms. Nelson and used transcripts of that interview to cross-examine Ms. Nelson at trial. Trial counsel was surprised that Ms. Nelson made such a solid witness at trial and commented that he was frustrated when she stuck "to her guns."

Trial counsel first met Petitioner in 1998, when Petitioner hired trial counsel to represent him in a murder case. Petitioner was acquitted in the 1998 case. Trial counsel could not recall whether Petitioner had gold teeth at that time. Trial counsel did recall that

Petitioner had gold teeth at the trial and remembered arguing the issue of the gold teeth to the jury. Trial counsel did not recall specific details about his cross-examination of Ms. Nelson but admitted that the transcript reflected that he did not question her about the gold teeth. Further, trial counsel admitted that he did not call a dentist to testify about when the teeth had been mounted. Trial counsel explained that he did not question Ms. Nelson about prior inconsistent statements because "[s]he was a steadfast either well-coached witness or just a good witness" and he felt that "strategy-wise" it was better to "back off."

Trial counsel recalled filing a motion to dismiss the case prior to trial because of the delay between incident and indictment. However, trial counsel did not recall the specifics of the argument because it was handled by co-counsel. Trial counsel felt that they could not show any prejudice due to the delay.

Trial counsel recalled that he did not present any evidence in mitigation at the sentencing hearing. Trial counsel determined that there was no mitigating evidence to present and that Petitioner's extensive criminal history supported the consecutive sentencing ordered by the trial court.

Trial counsel recalled the hearing on the motion for new trial. Trial counsel explained that his argument was based on newly-discovered evidence that warranted a new trial. Specifically, Petitioner's mother claimed immediately after the verdict that her other son committed the murder. Trial counsel only raised issues in the motion for new trial and on appeal that he thought had "the most merit."

At the conclusion of the hearing, the post-conviction court took the matter under advisement. In an order issued at a later time, the post-conviction court denied relief, determining that trial counsel effectively cross-examined Ms. Nelson and found "no proof to support [Petitioner's] allegation that the cross-examination was ineffective. Further, the post-conviction court determined that trial counsel's decisions were tactical. With regard to issues of identity, the post-conviction court accredited the testimony of trial counsel in that he "chose to proceed on the issues which he felt had the most merit." The post-conviction court determined that Petitioner's prior criminal history was extensive and trial counsel was not ineffective for failing to present proof at sentencing. Moreover, Petitioner did not present proof that he was prejudiced by not receiving a speedy trial. Specifically, the post-conviction court determined that, as a whole:

> [T]he testimony of trial counsel [is accredited] that he made strategic trial decisions. Despite the petitioner's assertions and assumptions that specific questions would have changed the outcome of the verdict, the Court finds that counsel was effective in his representation of the petitioner. The petitioner has

-8-

failed to prove the factual allegations by clear and convincing evidence. As to the petitioner's claims of ineffective assistance of appellate counsel, the Court finds that counsel strategically chose to pursue the issues he felt had the most merit and that petitioner has failed to prove the allegations by clear and convincing evidence.

On appeal, Petitioner argues that the post-conviction court improperly denied the petition for relief.

*Analysis*
*Post-Conviction Standard of Review*

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issues raised, we will afford those findings of fact the weight of a jury verdict, and this Court is bound by the post-conviction court's findings unless the evidence in the record preponderates against those findings. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *Alley v. State*, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This Court may not reweigh or re-evaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. *See State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. *See Shields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

*Ineffective Assistance of Counsel*

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997).

As noted above, this Court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. *See id.* at 578. However, our supreme court has "determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact . . . ; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. *Burns*, 6 S.W.3d at 461.

Furthermore, on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. 1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id.* However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

First, Petitioner argues that trial counsel failed to property cross-examine Ms. Nelson regarding her identification of Petitioner as the perpetrator and an alleged inconsistent statement. At the post-conviction hearing, trial counsel testified that he was surprised that Ms. Nelson was such a good witness for the State. He expressed frustration by the fact that she was "[sticking] to her guns" during her testimony. Trial counsel did not recall specific things about which he cross-examined Ms. Nelson at trial but explained that he did not feel like he was "getting anywhere" because she was such a "good witness" so his strategy was to "back off." The post-conviction court accredited the testimony of trial counsel. The record supports the post-conviction court's determination. Petitioner in this case has failed to establish by clear and convincing evidence that he is entitled to post-conviction relief on the basis of ineffective assistance of counsel.

Next, Petitioner argues that trial counsel was ineffective for failing to object to testimony by Detective Postiglione about Petitioner's girlfriend's statements. Further, Petitioner argued that trial counsel should have requested a limiting instruction so that the testimony could only be used for impeachment purposes. We have reviewed the transcript of the post-conviction hearing, and Petitioner failed to present any proof as to how this alleged deficiency on the part of counsel might have altered the outcome of his trial. His allegations of prejudice are pure speculation. Petitioner in this case is not entitled to post-conviction relief on the basis of ineffective assistance of counsel.

Next, Petitioner argues that trial counsel was ineffective because he failed to present proof to support a motion to dismiss after an alleged prosecutorial delay. At the hearing, trial counsel testified that he filed a pre-trial motion to dismiss because of the lengthy delay between incident and indictment. However, trial counsel admitted that he did not remember

the specifics of the motion or the hearing on the motion because it was argued by co-counsel. Trial counsel recalled that Petitioner would have been required to show prejudice in the delay, and trial counsel did not feel that they could show the prejudice required to secure relief. The post-conviction court accredited the testimony of trial counsel. The record supports the post-conviction court's determination. Petitioner in this case has failed to establish by clear and convincing evidence that he is entitled to post-conviction relief on the basis of ineffective assistance of counsel.

Petitioner next claims that trial counsel was ineffective for failing to present proof at the sentencing hearing. At the hearing, trial counsel explained that he did not present proof because there was no mitigating evidence to present. In addition, Petitioner's extensive criminal history supported consecutive sentencing. The post-conviction court accredited the testimony of trial counsel. The record supports the post-conviction court's determination. Petitioner in this case has failed to establish by clear and convincing evidence that he is entitled to post-conviction relief on the basis of ineffective assistance of counsel.

Petitioner contends that trial counsel was ineffective because he failed to ask the trial court, as the thirteenth juror, to grant a new trial due to insufficient evidence. At the hearing on the post-conviction petition, trial counsel acknowledged that he failed to raise sufficiency of the evidence as an issue in the motion for new trial. However, counsel for Petitioner did not ask trial counsel why he failed to raise this issue on appeal. Trial counsel did recall seeking a motion for judgment of acquittal, which the trial court denied. Further, trial counsel explained that he chose to pursue issues on appeal that had the most merit. Apparently, trial counsel felt that the sufficiency argument had little merit and chose not to pursue it on appeal. The record supports the post-conviction court's determination. Petitioner has failed to show how he was prejudiced by trial counsel's failure to raise this issue. Petitioner in this case has failed to establish by clear and convincing evidence that he is entitled to post-conviction relief on the basis of ineffective assistance of counsel.

Finally, with respect to trial counsel, Petitioner argues that trial counsel was ineffective for failing to challenge the admission of the crime scene and autopsy photographs in the motion for new trial. Trial counsel recalled at the hearing that he had filed a motion in limine to prevent admission of the photographs. This motion was denied by the trial court prior to trial. Trial counsel testified that he did not pursue certain issues at the motion for new trial stage because he only wanted to pursue issues that had the most merit. Additionally, he did not think that this issue "would have any effect at the Court of Appeals." Petitioner has failed to show how he was prejudiced by trial counsel's failure to pursue this issue in the motion for new trial. Petitioner in this case has failed to establish by clear and convincing evidence that he is entitled to post-conviction relief on the basis of ineffective assistance of counsel.

Petitioner also argues that counsel was ineffective on appeal, specifically, for failing to preserve issues necessary for appellate review in the motion for new trial. As stated above, trial counsel testified that he only pursued issues on appeal that he felt had "merit." The post-conviction court accredited the testimony of trial counsel that this was a tactical decision. Again, this Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See Adkins*, 911 S.W.2d at 347. Petitioner in this case has failed to establish by clear and convincing evidence that he is entitled to post-conviction relief on the basis of ineffective assistance of counsel.

*Conclusion*

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
JERRY L. SMITH, JUDGE